UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

ROYDEL HOWE,

                                       Plaintiff,

                  -against-

THE CITY OF NEW YORK, a municipal corporation and
THE NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES,

                                     Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS'
STATEMENT OF
UNDISPUTED MATERIAL
FACTS PURSUANT TO
LOCAL RULE 56.1**

07 Civ. 6079 (LTS)(THK)

             Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, defendants the City of New York City and The New York City Administration For Children's Services ("ACS"), (collectively referred to herein as "Defendants"), submit this Statement of Material Facts as to which there are no genuine issues to be tried:

             1. Plaintiff, a current Associate Accountant with ACS, brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Tile VII") and The Age Discrimination In Employment Act of 1967 ("ADEA"), alleging that defendants discriminated against him based upon his race, color, national origin and age. See Exhibit "A."[1]

**A.       Background**

---

[1]  Unless otherwise indicated, all exhibits cited to herein refer to those exhibits annexed to the Declaration of Camille D. Barnett, dated April 6, 2009, and submitted herewith.

2.   Plaintiff is a Black male from Jamaica, West Indies who is currently 67 years in age (date of birth. – February 15, 1942). See Exhibit "A" at ¶ 7.

3.   Plaintiff began his public employment in 1981 when he was hired into the title Accountant by the Office of the Comptroller.  In 1985, plaintiff voluntarily transferred to the New York City Human Resources Administration ("HRA") as an Associate Accountant.  In 1995, plaintiff moved within HRA into the Technical Assistance Unit ("TAU").  In 1996, ACS was formed and the TAU was one of the divisions that was moved from HRA to ACS.  Shortly thereafter, TAU became the Fiscal Support Unit ("FSU").  See Exhibit "A."

4.   In October 2001, HRA's TAU moved locations from Brooklyn to 66 John Street in Manhattan.  See Exhibit "B" 92: at 20-25; 93: at 1-4; 106: at 12-23.  It was around this time that plaintiff was first supervised by Mr. Bernard Gold.  See Exhibit "B" 107: at 15-17; 108: at 8-10.  Plaintiff testified that Mr. Gold is in his fifties.  See Exhibit "B" 123: at 5-7.  Mr. Gold was plaintiff's immediate supervisor and Mr. Gold reported to Mr. Larry Thomas.  See Exhibit "B" 130: at 22-25; 131: at 1-3.  Plaintiff testified that Mr. Thomas is African-American and was in his forties in or around 2001.  See Exhibit "B" 126: at 8-15.

5.   As an Associate Accountant, plaintiff is responsible for assessing day care programs funded by the ACS Office of Child Care, particularly, with regard to their compliance with ACS fiscal and related policies and procedures.  In particular, plaintiff visits child care programs to review the programs' financial policies and procedures, review financial books and records, identifies deficiencies and develop, with program, corrective action plans.  Plaintiff writes field visit reports, follows up on corrective action plans and investigates matters brought to the attention of ACS regarding the financial operation of daycare programs.  Plaintiff provides assistance to child care program boards and staff, both on-site and in the ACS office, in the area

of financial management and compliance.  Specifically, plaintiff reviews program audits and fiscal addenda, assist programs with developing fiscal improvement plans, follows up to ensure that audits and fiscal improvement plans are submitted in a timely manner, addresses requests for technical assistance from child care programs, follows up on other areas of program compliance including pension, welfare fund, tax payments, budget modifications, parent fee collection, accurate and timely submission of required forms and recordkeeping.  See Exhibit "C."

      6.  Mr. Gold testified at his deposition that his job duties as supervisor of plaintiff's unit was to monitor the fiscal performance of day care centers that received City funding and to make sure that there were complying with applicable City, State and Federal regulations and were spending money properly.  See Exhibit "D" 13: at 8-21.

      7.  Bernard Gold recalled first encountering plaintiff when he was asked to intervene in a situation where plaintiff complained about a female employee's playing of a radio at her desk.  See Exhibit "D" 7: at 20-25; 8: at 1-13.

**B.**     **Plaintiff's Allegations of Race, Color,  National Origin and Age Discrimination**

     **(a) Plaintiff's Complaints About His Co-Worker, Trevor Simpson.**

      8.  Plaintiff complains that that a co-worker, Trevor Simpson, who came into the unit in June 2001 created "inhumane, unbearable, fearful, violent and hostile working conditions and workplace environment."  See Exhibit "B" 131: at 15-24; 132: at 13-16; see also Exhibit "A."

      9.  Plaintiff testified that his co-worker Mr. Simpson eats bananas everyday at his desk and places the banana peel in the trash can which was next to plaintiff's desk, constantly talks, takes medication and shakes the pill bottle, laughs and sings, mumbles to himself, hits the

desk and yells at people and refers to people in a less than professional way.  See Exhibit "B" 133: at 11-25; 134: at 1-5.

10. Plaintiff also complained that Mr. Simpson's coffee cup was everywhere, and that he wasn't mindful of his environment.  See Exhibit "B" 135: at 6-7.

11. Plaintiff claims that Mr. Simpson sprayed air freshener on his food and played music at his desk.  See "Exhibit "E"; see also Exhibit "F," Attachment dated, February 20, 2007, ¶ 8.

12. Plaintiff testified that Mr. Simpson is African-American and believed that in 2001, Mr. Simpson was in his forties or "low" fifties.  See Exhibit "B" 135: at 22-23; 136: at 5-7.

13. Plaintiff testified that on October 26, 2001, Mr. Simpson removed the cover to his trash can despite an alleged agreement between them to cover the trash because plaintiff did not want the odor of the banana peel.  See Exhibit "B" 135: 1-6.

14. Plaintiff claims that Mr. Simpson allegedly commented to him to "drop dead, you foolish ass."  See Exhibit "B" 136: at 8-14.  Plaintiff does not attribute any age, color, national origin or race claims to Mr. Simpson.

15. Plaintiff verbally complained to Mr. Gold and Mr. Thomas about Mr. Simpson.  See Exhibit "B" 136: at 8-25; 137; at 1-2.

16. Plaintiff testified that Mr. Thomas said that he would make some changes and give plaintiff another seat and he was also told that the unit just moved to the location and things were going to change.  See Exhibit "B" 137: at 5-15.

17. Plaintiff testified that he was allowed to change desks but was five feet from his former location and Mr. Simpson. See Exhibit "B" 138: 3-10.

18. Plaintiff stated that this did not remedy the situation because although he and Mr. Simpson's chairs no longer got tangled, the "banana peel still permeated the entire area" and "I still hear him laugh and talk." See Exhibit "B" 138: at 11-17.

19. Plaintiff testified that he "continuously" complained about Mr. Simpson laughing, talking to himself and took his complaints to his union. See Exhibit "B" 139: at 17-21. Plaintiff asserts that the union said that they could not do anything. See Exhibit "B" 139: at 19-21; 141: at 9-15.

20. Mr. Gold testified that he as well as Mr. Thomas met with plaintiff a number of times to address plaintiff's complaints about Mr. Simpson. See Exhibit "D" 23: at 13-25. Mr. Gold testified that all complaints were investigated and meetings were held with the relevant parties. See Exhibit "D" 23: at 22-25; 25: at 12-17; 66: at 18-22; 25; 67: at 1-3.

21. In response to plaintiff's complaints concerning Mr. Simpson, The Director of the Office of Labor Relations, Clarence Jeffrey issued a letter to plaintiff's union representative, dated September 8, 2004. See Exhibit "G." The letter indicated that the Executive Director of plaintiff's unit, Larry Thomas:

> ...met separately with both Mr. Howe and Mr. Simpson, and with the unit as a whole, reiterating the need for all staff to be in compliance with applicable provisions of the Agency's Code of Conduct. He, however, was unable to corroborate any of the allegations made by Mr. Howe with other employees, but offered Mr. Howe a new workstation, after the second such meeting, which Mr. Howe accepted.

> Subsequent complaints were received from Mr. Howe and meetings held. Mr. Howe requested that higher workstation walls be erected to protect him from having to interact with Mr. Simpson. When informed that this could not be done, he requested

> that Mr. Simpson be moved to a more distant
> workstation.  At that point Mr. Howe was offered
> the option to move to a different workstation, where
> he would be out of Mr. Simpson sight and sound
> range. Mr. Howe refused that offer...

22. This correspondence goes on to state that:

> As outlined above, the Program's Executive
> Director has investigated the complaints made by
> Mr. Howe; he has met with both Mr. Howe, Mr.
> Simpson, and other staff members, but was not able
> to corroborate the allegations made by Mr. Howe.
> He has nonetheless changed Mr. Howe's
> workstation and subsequently offered him the
> option to move to a more distant workstation from
> Mr. Simpson. Id.

23. Mr. Gold also testified that plaintiff was repeatedly offered opportunities to
change his work station away from Mr. Simpson, but plaintiff stated that he liked where he was
located and refused to move. See Exhibit "D" 73: at 24-25; 74: at 1-8. Plaintiff acknowledged
that he was offered the opportunity to choose any seat that he wanted, however, he chose to
retain his seat "against the wall." See Exhibit "B" 144: at 3-10.

### (i) Plaintiff's Complaint  About His Former Supervisor, Bernard Gold.

24. In an e-mail dated, August 9, 2006, Executive Director, Larry Thomas advised
plaintiff that he expected him to submit the completed review by noon Thursday, 8/10/06. See
Exhibit "H."  Plaintiff responded in an e-mail dated August 10, 2006 that he was unable to meet
the deadline. Id. Mr. Gold also responded in an e-mail to plaintiff concerning Mr. Thomas'
August 9, 2006 e-mail. See Exhibit "I." The e-mail stated:

> [h]ave you seen the e-mail below? It is now 2:00
> pm and I have no response from you.  Your
> performance in this project has failed to meet job
> expectations and is unacceptable.  You have had
> two months to do this. Others in your unit have
> already submitted time and leave analyses for
> several programs with many employees and you

> have not submitted the analysis for the one program
> (George C. Conliffe) with only five employees.
> How do you explain this?  Id.

25. Plaintiff asserts that the aforementioned e-mail accused him of "unacceptable work performance" and was in retaliation for plaintiff's e-mail of August 9, 2006.  See Exhibit "A", Attachment C at ¶ 7.  Plaintiff's e-mail of August 9, 2006 was sent to Mr. Gold and stated that a particular child care program claimed that the program's bookkeeper was asked to make certain journal entries without documentation and that ACS threatened to withhold $201,339 in funds.  See Exhibit "J."

26. Plaintiff also complains about another e-mail from his then supervisor Bernard Gold, dated November 16, 2006, concerning plaintiff's poor work performance.  See Exhibit "A", Attachment C at ¶ 8; see also Exhibit "K."  This e-mail stated:

> I must, once again, bring to your attention another
> example of your failure to perform your work
> assignments in an acceptable and timely manner.
> As you know, the contract for the day care
> programs sponsored by Sheltering Arms was
> transferred to the Episcopal Social Services, which
> did not accept the accrued vacation time of the
> employees.   In cases like this, we pay the
> employees for their accrued time after reviewing the
> time and leave records and salaries and calculating
> the amount each employee is owed.   Since
> Sheltering Arms sponsored a number of day care
> programs with numerous employees, in order to
> expedite the process so the employees could receive
> compensation in a timely manner and avoid
> potential grievances, I divided the work among the
> members of the unit.   Due to your lethargic
> performance on previous similar assignments, I
> assigned you the fewest number of employees
> whose accrued time needed to be calculated.   In
> spite of this, you lagged behind the other workers in
> the unit in completing the assignment and, in fact,
> did not complete it.

On 11/3/06, a reminder was sent to you via e-mail about the assignment which you were asked to complete by the close of business on 11/8/06. When you still had not completed it by that date, it was removed from your responsibility and given to another worker to complete since, by your poor performance, you were holding up the process and delaying payment for approximately seventy-five day care employees. Never once, since you had the assignment, did you ask for assistance, though I inquired several times abut your progress.

This will, of course, be considered during your annual performance evaluation.

If, in the future, you are having a problem completing an assignment in a timely manner, I expect that you will inform me so that we can determine the cause of the problem and take appropriate measures to resolve it. Id.

27. Plaintiff was originally given the aforementioned assignment on October 18, 2006. Id.

28. Plaintiff interpreted the reference to his "lethargic performance" as Mr. Gold's "attempt to persuade" him "that old age had rendered" him "incompetent…" See Exhibit "A", Attachment C at ¶ 8.

29. Plaintiff believes that Mr. Gold sent the above-referenced e-mails because of his age and color. See Exhibit "A", Attachment C at ¶ 12.

30. However, Plaintiff testified that Mr. Gold did not make any statements concerning his race, color, national origin or age. See Exhibit "B" 160: at 2-14.

31. On May 2, 2005, Bernard Gold sent plaintiff an e-mail which stated that:

> [v]arious units of ACS Financial services have expressed concern about the means by which you request information from them. Although I believe that you are being conscientious in requesting information that is necessary for you to perform your job, we need to discuss the best way to do this. I would like to meet with you on Wednesday, May 4, at 11:00 AM to discuss this. Until then, please refrain from any direct contact with any and all units that comprise ACS Financial services at 150 William Street. See Exhibit "L."

32. Mr. Gold testified that he received complaints from the payments unit and the audit review unit that plaintiff was calling and harassing them and going over to their offices without an appointment. See Exhibit "D" 36: at 23-25; 37: at 1-2. These units complained that plaintiff was disrupting their work and requested that if plaintiff needed information from them, that he should go through him to secure the information. See Exhibit "D" 37: at 3-9.

33. Mr. Gold testified that he didn't fault plaintiff for trying to get information but was advised that the way that plaintiff was going about obtaining the information caused a lot of friction. See Exhibit "D" 17: at 12-15. As such, plaintiff was asked to go through Mr. Gold to obtain such information. See Exhibit "D" 37: at 17-20.

34. Additionally, on May 20, 2005, Mr. Gold sent plaintiff an e-mail concerning his "Lack of Compliance with Supervisory Directives." See Exhibit "M." The e-mail goes on to state the following:

> 1) On Friday, May 13th, I sent you a list of programs that had not submitted audits. I asked you to contact them and give me certain information. On Monday, I again sent you a reminder and asked for the information by c.o.b. Monday, May 16th. As of this afternoon I have not received it or any explanation as to why you have not submitted it.

2) I have asked you to submit a field work schedule by noon each Friday for the following week. As of 4:00 PM today, you have not submitted your field work schedule for next week.

3) I have asked you to schedule visits for at least two programs each week since the beginning of May. By now, you should have scheduled six programs during this month. I have seen nothing to indicate you have done so. I am aware of only one program visit, the one I schedule, Miracle Makers.

4) On 5/16/05, I sent you an e-mail asking you questions about your involvement in the QWL Committee. Thus far, I have received no response. I will not sign your time sheets for any time you attend these functions until I receive the information requested.

In addition, I was informed that you acted in a very hostile and belligerent manner two weeks ago to the new worker, Mr. Chappell, loudly and publicly accusing him of something that he denied doing. There was also a recent complaint by the receptionist on the 10th floor at 150 William Street that you refused to stop at the reception desk and refused to be announced to the party you wanted to visit. There have also been complaints from the payments and audit review units at 150 William Street that you entered unannounced and without an appointment and demand information.

I am scheduling a meeting for Wednesday, May 25, at 11:00 am in my office to discuss your continued lack of compliance with supervisory directives as well as other behavior mentioned above, some of which we have previously discusses, Such behavior is inimical to the work we expected to do and to the work environment will not be tolerated. Id.

35. Plaintiff's complains that this May 20, 2005 email from Mr. Gold was "framed to complement his own subjective agenda." See Exhibit A, Attachment, pg. 3, ¶ 10. In a memorandum dated, May 31, 2005, Mr. Gold summarized the discussion held during his May

25th meeting with plaintiff.   See Exhibit "N." Mr. Gold explained that plaintiff's actions constituted "poor performance of the tasks and standards in your job description" and enumerated a list of expectations for plaintiff's future work performance and corrective action plaintiff was required to take to avoid disciplinary action. Id.

36. In an email dated, June 8, 2005, Mr. Gold indicated that plaintiff had not returned a signed copy of the May 31, 2005 memo which discussed performance issues and described actions plaintiff must take to resolve such issues.  Additionally, it was noted that plaintiff failed to submit weekly schedules and Field Visit reports. See Exhibit "O."

37. In an email dated, July 28, 2005, Mr. Gold advised plaintiff that he failed to comply with a previous supervisory instruction. See Exhibit "P."  In particular, in an earlier e-mail of "high" importance, dated July 19, 2005, Mr. Gold instructed plaintiff to visit a program "asap" and take certain actions. Plaintiff was also asked to advise Mr. Gold as to the date he will visit the program.

38. Over a week later however, Mr. Gold had not been advised by plaintiff that he had arranged a visit.  Mr. Gold instructed plaintiff to contact a staff member and proceed as instructed in the prior e-mail. Id.

39. Plaintiff further asserts that Mr. Gold's correspondence to him were in retaliation and reprisal for plaintiff's correspondence to him, "plus the Union was calling him, and he was aware that I sent correspondences to many other Responsible Personnel." See Exhibit A, Attachment, pg. 4, ¶ 13.  Plaintiff claims that "[s]ome of Mr. Gold's policies and practices executed against me or caused to be executed against me to the detriment of my life, my health, my continued employment, my work performance, the Day Care Centers (DCC) and the Agency's official business; nonstop from October 2001, through November 2006, included but

not limited to: total absence of all forms respect, courtesy, and ethics." See Exhibit A, Attachment, pg. 4, ¶ 12.

40. Plaintiff does not have any complaints concerning Mr. Thomas and does not believe that he discriminated against him. See Exhibit "B" 126: at 16-18; 143: at 15-18; 161: at 13. Plaintiff testified that Mr. Thomas has never recommended or taken any disciplinary action against him, never evaluated or reprimanded him, nor has he recommended or tried to terminate him. See Exhibit "B" 147: at 25; 148: at 1-9. Plaintiff further stated that Mr. Thomas has not made any comments concerning his race, age, color or national origin. See Exhibit "B" 147: at 14-24.

41. Plaintiff testified that his unit currently consists of three individuals including himself, Ms. Crump and Mr. Simpson. See Exhibit "B" 151: at 1-7. Plaintiff believes that Ms. Crump is African-American, in her fifties and from Barbados. See Exhibit "B" 152: at 13-20.

42. Plaintiff further complains about memos Mr. Gold sends to all employees in the unit but which plaintiff believes that that "while he may address it to the three of us, me alone is intended." See Exhibit "B" 152: at 23-25; 153: at 5-7, 13-18; see also Exhibit "BB."

43. Plaintiff complained that Mr. Gold's attitude towards him was not professional. See Exhibit "B" 155: at 16-25; 156: at 1.

44. Mr. Gold retired from ACS in July 2007. See Exhibit "B" 154: at 25; 155: at 1; see also Exhibit "D" 6: at 2-13.    Plaintiff acknowledged that Mr. Gold did not proceed with any disciplinary action against him, that he has never been brought up on disciplinary charges and no disciplinary actions have been taken against him. See Exhibit "B" 160: at 25; 161: at 1-5; 175: at 8-10.

45. Plaintiff testified that he has not sought treatment from a health care of mental health provider as a result of the claims he asserts in this lawsuit.  See Exhibit "B" 188: at 11-16.

46. Plaintiff is still employed by ACS in its Technical Assistance Unit and from 2005 to 2008, has been receiving salary increases.  See Exhibit "B" 189: at 12-24.

### (ii) Plaintiff's 2006 Grievances

47. In 2006, plaintiff's union filed a grievance on his behalf.  See Exhibit "Q." The grievance sought to have plaintiff assigned to perform in-title work and that ACS take appropriate steps to ensure what it characterized as Mr. Simpson's abusive behavior cease and that any counseling memos be removed from Mr. Howe's personnel file.

48. A Step II hearing was conducted on September 28, 2006, where plaintiff received union representation.  See Exhibit "R."  The Step II Grievance Decision denied plaintiff's grievance.  In particular, in reference to plaintiff's claims that "he was harassed by a fellow employee and that he had received disparate treatment from his manager, a review of earlier files pertaining to these charges was conducted.  These claims were found to be unsubstantiated.  Concerning plaintiff's out-of-title claim, it was determined that plaintiff was assigned to the correct title and level appropriate for the assigned responsibilities.

49. On January 18, 2007 a Step III conference was held concerning the grievance. See Exhibit "S."  In a decision dated, February 20, 2007, Review Officer Joseph F. Tremiti determined and concluded that plaintiff was performing work commensurate with his assigned duties and responsibilities as an Associate Accountant.  It was noted that regarding computerized responsibilities, plaintiff is obligated to keep accurate books and records, which can be achieved either manually or with the aid of a computer.

50. Plaintiff filed another grievance which claimed that ACS violated the City Wide and Accounting Collective Bargaining Agreement, as well as its own procedures by: e-

mails of 8/10/06 to plaintiff regarding the School Age Classroom Closing project; poor working conditions caused by the behavior of a co-worker; removal of a printer from his desk and various additional complaints regarding work issues and treatment received dating from 2001-2005. See Exhibit "T." As a remedy plaintiff sought the discipline of his supervisor, removal of the offending co-worker to another area and restoration of a printer to his desk.

51. The Step II Grievance Decision denied plaintiff's grievance. In particular, it was determined that supervisory feedback, such as that in the aggrieved 8/10/06 e-mail, is a management prerogative that does not constitute a contractual violation. Plaintiff has the contractual right of rebuttal to the evaluatory statement in his file. He so rebutted, and his response is on record. Also, it was found that there was no contractual right to have a printer on plaintiff's desk and with respect to the complaint regarding a co-worker, plaintiff was offered by management an alternative work space in another area, which he refused. Id.

52. Mr. Gold testified that plaintiff had an unauthorized printer on his desk that was owned by the City but was not a network printer. See Exhibit "D" 55: at 15-25; 56: at 1-8. According to ACS' MIS department, an unauthorized equipment could jeopardize the integrity of the system, so MIS removed the printer. See Exhibit "D" 56: at 1-18

## C.    Plaintiff's Improper Practice Petition

53. On December 5, 2005, plaintiff filed an improper practice petition against the City of New York, ACS and his Union. See Exhibit "E." The Office of Collective Bargaining ("OCB") issued a written Decision and Order, dated October 25, 2006. Plaintiff, in part, alleged that his union breached its duty of fair representation when it failed to file grievances on his behalf. Plaintiff complained that as of October 2001, when his unit moved locations, Trevor Simpson "disrupted the work environment by playing music at his desk at a  loud volume, singing, talking and laughing loudly at his desk, and by speaking on the phone regarding non-

ACS matters." Plaintiff also complained that Mr. Simpson, "was extremely abusive" to plaintiff" and other ACS employees, would regularly scream at them, would insist that other employees not eat lunch at their desks, and would vandalize other employees' desks." Id. at p. 3. The Decision and Order went on to state that in January 2002, plaintiff "was moved to a different workstation. However, according to plaintiff, he was now only five feet away from this employee, who continued to be a nuisance." Id. at pg. 3. Plaintiff alleged that his complaints were ignored by his supervisors. Plaintiff also claimed that Mr. Gold prevented him from communicating with other units within ACS and was forced to work in isolation. Id. at p. 12. He further contends that ACS discriminated, harassed an retaliated against him and Mr. Gold and other ACS management members subjected him to more stringent work rules than other ACS employees, subjected him to threats of discipline and gave him unfavorable performance evaluations as a result of his complaints against ACS. Moreover, plaintiff contends that he had to submit Field Visit forms and weekly scheduled and continually subjected to the abusive and disruptive behavior of an ACS employee, despite his complaints. Finally plaintiff alleged that ACS unilaterally changed his working conditions by forcing him to file documents he had never filed before, forcing him to submit time sheets in a different manner than other employees and performed his job duties in a different manner than before. Id. at p. 13.

54. The decision informed that the mere assertion of retaliation was not sufficient to prove that management committed an improper practice, and allegations of improper motivation must be based on specific, probative facts rather than on conclusions based on surmise, conjecture or suspicion. It was determined that Mr. Gold and other ACS management personnel did not harass, discriminate or retaliate against plaintiff because of his protected activity. Id. at p. 22.

55. Plaintiff's complaint that ACS refused to apply its regulations concerning radios at an employee's desk failed to indicate that such failure was a result of plaintiff's protected activity or that the regulation was disparately enforced, preventing other employees from using radios at their respective desks. Additionally, it was determined that there was no indication that plaintiff's protected activity was an impetus for the removal of the printer, that such action did not constitute an adverse employment action and Mr. Gold expressed legitimate business reasons for the removal – to prevent corruption of the ACS computer network. Id. at pgs. 22-23.   It was determined that removal of the printer was not retaliatory. Id. at p. 23.

56. The OCB panel found that plaintiff's contention that he was the only employee in his unit required to submit both weekly schedules and Field Visit forms was contradicted by the evidence. Id. at p. 23. All employees of the unit were required to do this and thus, plaintiff's harassment claims was not born out by the record. Id.

57. Concerning Mr. Gold's communications to plaintiff, it was determined that the record failed to demonstrate that Mr. Gold and ACS issued critical evaluations to plaintiff because of his protected activity. The record further did not demonstrate that other employees in the unit were not subjected to the same evaluation criteria or that plaintiff received any evaluations unfairly and unjustly. Id at p. 24. Rather, the record showed that Mr. Gold acted in a supervisory capacity when he attempted to raise awareness of and correct the missteps of an employee under his charge. Moreover, the record contained no actual performance evaluations or any probative facts linking plaintiff's negative evaluations and his complaints against ACS. Plaintiff's allegations concerning negative evaluations were found to be conclusory and based on surmise. Additionally, Mr. Gold as plaintiff's supervisor stated that plaintiff did not need the

information he sought from other unit employees to perform his tasks effectively.  See Exhibit "E" at p. 20.

58. Furthermore, concerning plaintiff's complaints about a denial for annual leave, it was found that plaintiff's supervisor acted consistent with regulations specifying the manner in which an employee is to request annual leave.  See Exhibit "E" at pgs. 24-25.

59. Plaintiff's union was found not to have breached its duty of fair representation and plaintiff's improper practice petition was denied in its entirety.  See Exhibit "E" at pgs. 17-18, 26

60. Finally, it was determined that plaintiff lacked standing to file a claim related to alleged unilateral changes to established terms and conditions of employment, and as such, that claim was dismissed.  See Exhibit "E" at p. 25.

**D.      Prior To The Complaints Asserted In The Instant Lawsuit, Plaintiff Exhibited Poor Performance, Interpersonal Conflicts And Failures To Adhere To Supervisory Directives.**

61. In a memorandum to plaintiff from the Assistant to the Division Executive Director, Linda Williams, dated February 14, 2000, plaintiff was advised that he contradicted prior instructions for reporting arrivals and departures in the field.   See Exhibit "U."  The unit was instructed to report their work time by phone to certain individuals no later than 10:00 am and submit field visit schedules with their time sheets in the supervisor's In Box.  Plaintiff was advised that his "failure to comply with clearly stated work instructions has increasingly become a pattern" and that should he "continue to defy the policies and procedures, under which we all work, a more serious action may be recommended."

62. Additionally, in a Memorandum dated, March 7, 2000, Lillian Williams advised plaintiff that he was the only employee who had not submitted a monthly field schedule for March.  See Exhibit "V."  Plaintiff was further advised that:

[y]ou were observed spending an inordinate portions of every Friday in January/February typing your timesheets on the PC instead of making your February/March field appointments. You misused more work time by issuing an inaccurate and unnecessary memorandum, claiming insufficient time. You delayed keeping a Monday morning field appointment by making unauthorized office visit, in order to write a memorandum to someone beyond your division and outside of the appropriate office channels.

63. Plaintiff was given instructions to address his "serious time management problems" and "continued failure to manage [his] caseload assignment."

64. In another memorandum dated, August 2, 2000, Lillian Williams addressed plaintiff's failure to submit timely field appointments. See Exhibit "W." Plaintiff was asked to explain why out of 19 field days in the month of August, he only made 7 field appointments and thus, failed to perform his essential job function.

65. In a memorandum for Lillian Williams, dated September 5, 2000, Lillian Williams addressed plaintiff's refusal to complete assignments. See Exhibit "X." Specifically, the entire field staff was asked to submit a summary of the number of times their assigned day care programs were visited and to identify their beast and worst programs based on certain criteria. Ms.. Williams however was advised that plaintiff refused to submit the summary or identify his best and worst programs. A meeting was scheduled to discuss plaintiff's response.

66. Plaintiff testified that Ms. Williams was Black and she was in her fifties to early sixties at the time. See Exhibit "B" 121: at 23-25; 122: at 1-7.

E.      Plaintiff's Internal EEO Complaint

67. On June 17, 2005, plaintiff filed a complaint with ACS' Office of Equal Employment Opportunity ("EEO") on the grounds of unjust and illegal treatment, including

discrimination, reprisal harassment, etc. See Exhibit "Y."  Plaintiff complained that Mr. Gold lacked expertise about the job he supervises and harassed him because of his complaints about Mr. Simpson.  In addition, plaintiff complained that he setup an old discarded computer to operate an accounting program but Mr. Gold instructed personnel to remove the computer from his desk because there were complaints that it was noisy and because it was unfair to the others for plaintiff to have two computers while they only had one.  Plaintiff complained the Mr. Gold asked him to detail his actual departure and arrival time on his timesheet and about Trevor Simpson's music, although plaintiff acknowledged that Larry Thomas asked Mr. Simpson to stop playing music and such action was stopped at that time.  Also, plaintiff complained about Mr. Gold's e-mails to him of May 2, 2005 and may 12, 2005.

68. Plaintiff recalled meeting with Ms. Salley from EEO and her advising and noting that some of plaintiff's complaints were for the union, and some had been resolved.  See Exhibit "B" 177: at 2-8; see also Exhibit "Z."

69. A report from ACS' EEO Office reveal that plaintiff's complaint was administratively closed.  See Exhibit "Z."  Notably, when explicitly asked "why he believed Mr. Gold might be singling him and doing theses things", plaintiff said he was "uncertain" and offered no theories.  Plaintiff was advised to bring his complaints to his union.

## F.    Plaintiff's Charge Of Discrimination With The United States Equal Employment Opportunity Commission.

70. On February 20, 2007, plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  See Exhibit "F." Plaintiff alleged discrimination based on race, color, sex, age, and national origin and also claimed retaliation.  Plaintiff detailed that from October 2001 through November 2006, ACS practiced various forms of discrimination against him.  Plaintiff claimed that ACS encouraged,

rewarded, and supported one of his coworkers create and maintain a very hostile work environment, and discriminatory practices against him.

71. Following a review of the evidence, the EEOC determined that it failed to indicate that a violation had occurred. The EEOC could not conclude that ACS violated either Title VII of the ADEA with respect to the issues raised on plaintiff's charge. See Exhibit "AA." The EEOC found that plaintiff failed to establish r prima facie case of discrimination.

72. In accordance with the dismissal of the charge, on or about April 2, 2007, the EEOC issued a Right to Sue Letter. See Exhibit "A."

73. On or about June 27, 2007, plaintiff filed the instant complaint. See Exhibit "A."

74. As such, the EEOC issued a Right to Sue Letter dated. See Exhibit "A."

Dated:      New York, New York
            April 6, 2009


MICHAEL A. CARDOZO
Corporation Counsel of the
 City of New York
Attorney for Defendant
100 Church Street, room 2-144
New York, New York 10007
(212) 788-8685
CBarnett@law.nyc.gov

By: _____
        Camille D. Barnett
        Assistant Corporation Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

ROYDEL HOWE,                                          07 Civ. 6079 (LTS)(THK)

                                    Plaintiff,

                -against-

THE CITY OF NEW YORK, a municipal corporation and
THE NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES,


                                    Defendants.

------------------------------------------------------------------------ x

## CERTIFICATE OF SERVICE

I hereby certify that, on April 6, 2009, I caused a true and correct copy of the foregoing

Defendants' Statement Of Undisputed Material Facts Pursuant To Local Rule 56.1, to be served by

First Class Mail on Roydel Howe, at 169-04 88th Avenue, #1J, Jamaica, New York 11432.

Dated:          New York, New York
                April 6, 2009

                               MICHAEL A. CARDOZO
                               Corporation Counsel of the
                                City of New York
                                Attorney for Defendants
                               100 Church Street, Room 2-144
                               New York, New York 10007
                               CBarnett@law.nyc.gov
                               (212) 788-8685

                        By:    Camille D. Barnett
                               Assistant Corporation Counsel

Docket No. 07 Civ. 6079 (LBS)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROYDEL HOWE,

Plaintiff,

-against-

THE CITY OF NEW YORK, a municipal
corporation; AND THE NEW YORK CITY
ADMINISTRATION FOR CHILDREN'S
SERVICES

Defendants.

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for the Defendants*
*100 Church Street, Room 2-144*
*New York, N.Y. 10007*

*Of Counsel: Camille D. Barnett*
*Tel: (212) 788-8685*
*LawManager No. 2007-032788*

*Due and timely service is hereby admitted.*
*New York, N.Y.    , 200*
*Esq.*
*Attorney for*